UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHERI LEE H.,

                 Plaintiff,

     -v-                              5:19-CV-10

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                         OF COUNSEL:

LAW OFFICES OF KENNETH HILLER, PLLC    KENNETH R HILLER, ESQ.
Attorneys for Plaintiff                  JUSTIN M. GOLDSTEIN, ESQ.
6000 North Bailey Avenue, Suite 1A
Amherst, NY 14226

SOCIAL SECURITY ADMINISTRATION       FERGUS J. KAISER, ESQ.
   OFFICE OF REGIONAL GENERAL       Special Ass't United States Attorney
   COUNSEL – REGION II
Attorneys for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

     Plaintiff Cheri H.[1] ("plaintiff" or "claimant") brings this action seeking review of a final

decision by defendant Commissioner of Social Security ("Commissioner" or "defendant")

---

    [1] In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be mentioned in this opinion.

denying her application for Disability Insurance Benefits ("DIB"). Defendant has filed a

certified copy of the Administrative Record and both parties have briefed the

matter.[2] Plaintiff's appeal will be considered on the basis of these submissions without oral

argument.

## II. **PROCEDURAL HISTORY**

On April 9, 2013, plaintiff filed an application for DIB alleging that her neck and spine

problems, lupus, migraines, depression, and fibromyalgia rendered her disabled beginning

on March 15, 2007. R. at 91-92, 110-13, 270-71.[3]

On June 27, 2013, the Commissioner denied plaintiff's DIB claim. R. at 90-104,

148-51. Thereafter, at plaintiff's request, defendant ordered an Administrative Law Judge

("ALJ") to conduct a *de novo* review of her application for benefits. *Id*. at 128-30, 152-53.

On May 28, 2014, ALJ Robert E. Gale presided over a hearing on plaintiff's request for

benefits. R. at 63-89. The ALJ conducted the hearing by video from Syracuse, New

York. *Id*. at 108. Plaintiff, represented by non-attorney Matthew Nutting, appeared and

testified by video from Utica, New York. *Id*. At the hearing, plaintiff amended her alleged

onset date to February 27, 2013. *Id*.

On November 13, 2014, the ALJ issued a written decision denying plaintiff's

application for DIB from February 27, 2013, the amended alleged onset date, through June

30, 2013, the date claimant was last insured for purposes of the Regulations. R. at 105-17.

However, on July 27, 2016 the Appeals Council vacated the ALJ's November 2014

_____

[2] General Order 18 provides, *inter alia*, that a claimant's appeal from the Commissioner's final decision denying benefits will be treated as if the parties have included in their briefing cross-motions for judgment on the pleadings under Fed. R. Civ. P. 12(c).

[3] Citations to "R." refer to the Administrative Record. Dkt. No. 6.

decision and remanded plaintiff's case back to an ALJ to (1) resolve certain outstanding issues, including the issue of whether plaintiff's self-employment as a babysitter rose to the level of substantial gainful activity; (2) further develop certain aspects of the record; and (3) obtain the testimony of a Vocational Expert.  R. at 124-26.

On November 28, 2017, ALJ Jennifer Smith presided over another hearing in accordance with the Appeals Council's remand order.  R. at 35-62.  The ALJ conducted the hearing from Syracuse, New York.  *Id*.  Plaintiff, represented by non-attorney Matthew Nutting, appeared in person and testified.  *Id*.  The ALJ also heard testimony from Vocational Expert ("VE") Joseph Atkinson.  *Id*.  At the hearing, plaintiff further amended her alleged onset date to December 27, 2013.  *Id*.

On December 21, 2017, the ALJ issued a written decision denying plaintiff's claim from December 27, 2013, the amended alleged onset date, through September 30, 2013, the date claimant was last insured for purposes of the Regulations.  *Id*.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for further review.  *Id*. at 1-6.

## III.  **LEGAL STANDARDS**

### A.  **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied.  *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

"First, the Court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard."  *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  "Failure to apply the correct legal standards is grounds for reversal."  *Townley v.*

*Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

"Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada*, 167 F.3d at 773. "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 556 F.3d at 305 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. *See Williams*, 859 F.2d at 258. Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld—even if the court's independent review of the evidence may lead it to a different conclusion than the one reached by the Commissioner. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## B. The Commissioner's Disability Determination

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

physical or mental impairment or impairments [must be] of such

> severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Section 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ must determine whether the claimant has engaged in substantial gainful activity. A claimant engaged in substantial gainful activity is not disabled, and is therefore not entitled to benefits. §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an impairment listed in Appendix 1 of the regulations (the "Listings"). 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant whose impairment or combination of impairments meets or equals one of the Listings is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149.

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether—despite the claimant's severe impairment—the claimant still has the residual functional capacity ("RFC") to perform any past relevant work. 20 C.F.R. §§ 404.1520(f),

416.920(f).

The burden of proof with regard to these first four steps is on the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). However, if it is determined that the claimant cannot perform any past relevant work, the burden shifts to the Commissioner for step five. *Id*.

This fifth step requires the ALJ to examine whether the claimant can do any type of work. 20 C.F.R. §§ 404.1520(g), 416.920(g). The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary. *Perez*, 77 F.3d at 46.

The Commissioner typically meets the burden at step five in one of two ways. If a claimant's impairments are primarily or exclusively exertional in nature, defendant may appropriately rely on the Medical–Vocational Guidelines contained in 20 C.F.R. Pt. 404, Subpt. P, App. 2. *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (summary order).

Commonly known as "the Grid" or "the Grids," the Medical–Vocational Guidelines are a collection of tables that "simplify and expedite the determination of disability" by offering "predeterminations of disability or non-disability for individual cases based on various combinations of residual functional capacity, age, education and work skill." *Davis v. Shalala*, 883 F. Supp. 828, 832 (E.D.N.Y. 1995) (citation omitted)

Notably, the Commissioner may rely on the Guidelines even if a claimant suffers from one or more non-exertional impairments. *See, e.g.*, *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) (Cardamone, J.) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines.").

However, if a claimant's non-exertional limitations "significantly diminish" the residual capacity to work, the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Chaparro v. Colvin*, 156 F. Supp. 3d 517, 537 (S.D.N.Y. 2016) (citation and internal quotation marks omitted).

## IV. DISCUSSION

### A. The ALJ's Decision

First, the ALJ determined that plaintiff's earning record showed sufficient quarters of coverage to remain insured through September 30, 2014, the date last insured ("DLI") for purposes of the Regulations.[4] R. at 14. Because eligibility for DIB hinges on whether a claimant can establish the onset of a qualifying disability before the DLI, the ALJ concluded that the relevant time period in this case ran between December 27, 2013, the amended alleged onset date, and September 30, 2014, the DLI (the "relevant time period"). *Id*.

Next, applying the five-step disability determination, the ALJ found that: (1) plaintiff had not engaged in substantial gainful activity during the relevant time period; (2) plaintiff's systemic lupus, cervical spondylosis and status post cervical fusion were severe impairments within the meaning of the Regulations; and that (3) these impairments, whether considered individually or in combination, did not meet or equal any of the Listings during the relevant time period. R. at 15-18.

At step four, the ALJ determined that plaintiff's impairments caused exertional and

---

[4] The date last insured ("DLI") is a technical term used by the Commissioner to mark the last day on which a claimant is eligible for DIB and is calculated using the claimant's recent work history—broadly speaking, taxes paid into the Social Security system accrue as "work credits" that provide quarters of insurance coverage under the program. *See, e.g.*, *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (Cardamone, J.).

non-exertional limitations during the relevant time period.  R. at 18-22.  However, the ALJ

found that plaintiff still retained the RFC to

> perform sedentary work . . . except that she should not climb
> ladders, ropes and scaffolds, balance, kneel, crouch and
> crawl . . . . [s]he can occasionally climb ramps and stairs and stoop,
> frequently reach, handle, finger and feel but should not work at
> unprotected heights or work in close proximity to dangerous
> machinery or moving mechanical party of equipment . . . . [she]
> should be able to change positions every 30 minutes and retains the
> ability to stay on task at the work station during the position
> change . . . . [and she] retains the ability to frequently extend, flex
> and rotate her cervical spine.

*Id*. at 18.

According to the ALJ, this RFC precluded plaintiff from performing her past relevant

work as a "licensed practical nurse" at any time during the relevant time period.  R. at 22, 53.

However, the ALJ found that this RFC, considered together with plaintiff's age and education,

still allowed her to perform the job duties of a "document preparer," a "charge account clerk,"

and an "addresser" during the relevant time period.  *Id*. at 23.

Because these representative jobs fit in with plaintiff's assessed limitations and were

present in sufficient numbers in the national economy, the ALJ concluded plaintiff was not

disabled within the meaning of the Regulations.  R. at 23-24.  Accordingly, the ALJ denied

plaintiff's application for benefits from December 27, 2013, the amended alleged onset date,

through September 30, 2014, the DLI.  *Id*.

## B. <u>Plaintiff's Appeal</u>

On appeal, plaintiff contends the ALJ mis-weighed the medical opinions in the record

and, as a result of this error, formulated an RFC that failed to account for all of her exertional

and non-exertional limitations.  Pl.'s Mem., Dkt. No. 11 at 17-36.[5]

## 1. <u>Severity at Step Two</u>

As an initial matter, however, the Commissioner has identified and addressed a discrete step two argument nested inside of plaintiff's briefing on the ALJ's RFC determination.  *See* Def.'s Mem. at 8-9 (citing Pl.'s Mem. at 34).[6]  According to defendant, plaintiff contends the ALJ erred at step two in failing to find her migraine headaches "severe."  *Id*.

At step two, the ALJ must determine whether a claimant has one or more "severe" impairments that significantly limits her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  These so-called "basic work activities" include "walking, standing, sitting, lifting, carrying, pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, remembering and carrying out simple instructions, using judgment, and responding appropriately to supervision, co-workers, and usual work situations."  *Erik Allen M. v. Berryhill*, 2019 WL 3565944, at *3 (N.D.N.Y. May 22, 2019) (citation omitted).

"As a general matter, this step of the sequential evaluation process sets a low bar that is intended only to screen out disability claims based on *de minimis* impairments."  *Erik Allen M.*, 2019 WL 3565944, at *3 (citing *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 152 (N.D.N.Y. 2012) (Kahn, J.)).  "Even so, the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment,' is insufficient to

---

[5]  Pagination corresponds to CM/ECF.

[6]  Plaintiff's memorandum of law does not include a table of contents.  Without one, it is more difficult to determine the nature and extent of plaintiff's various arguments—that is why the local rules require litigants to include one in each brief.  N.D.N.Y.L.R. 7.1(a)(1) ("All memoranda of law shall contain a table of contents."); *see also Tahira H. v. Comm'r of Soc. Sec.*, 2020 WL 42823, at *4 n.5 (N.D.N.Y. Jan. 2, 2020) (observing same failing in brief filed by same attorney of record in a different disability case).

render a condition 'severe' within the meaning of the Regulations." *Id*. "Rather, the burden at this step falls on the claimant to identify how the particular symptomatology stemming from the impairment claimed to be 'severe' actually works to 'significantly limit' his physical or mental ability to complete 'basic work activities.'" *Id*. (quoting *Lake v. Colvin*, 2016 WL 2757750, at *4 (N.D.N.Y. May 12, 2016)).

Upon review, there is no step two error in this case. Plaintiff cites to some record evidence showing that she received ongoing treatment for her migraines, and that at one point she experienced six to ten migraines per month. Pl.'s Mem. at 34. However, as the Commissioner correctly notes, the record evidence that indicates plaintiff experienced "six to ten migraines per month" is a self-report from June 6, 2013, six months before the start of the relevant time period in this case. Def.'s Mem. at 9.

Of course, evidence from before or after the relevant time period often provides necessary context for a disability claim and, if so, an ALJ cannot simply ignore it. *Cf. Norman v. Astrue*, 912 F. Supp. 2d 33, 82 n. 74 (S.D.N.Y. 2012) ("[T]he mere absence of contemporaneous medical evidence of a disabling condition during the relevant time period does not necessarily preclude a finding of disability."). However, "the ALJ has both the ability and the responsibility to resolve conflicts in the evidence." *Doty v. Comm'r of Soc. Sec.*, 2017 WL 4621630, at *6 (N.D.N.Y. Oct. 13, 2017) (Suddaby, J.).

For instance, if plaintiff's evidence suggesting that she suffered frequent migraines (at least before the relevant time period) stood uncontested in the record, it might well be inappropriate for the ALJ to ignore it or to reject it out of hand. R. at 627. But this evidence does not stand uncontested in plaintiff's file. To the contrary, as the ALJ observed in her written decision, evidence elsewhere, including at least one treatment record from April 23,

2014—a date within the relevant time period—indicates that plaintiff's migraine headache medication "was working 'very well'" to control the symptoms of her headaches. R. at 20 (citing R. at 844). And it is the limiting effects of symptomatology, not mere diagnosis, that matters when assessing severity at step two. *Erik Allen M.*, 2019 WL 3565944, at *3.

In this case, the ALJ acknowledged the fact of plaintiff's prior migraine headaches, examined the record evidence, and determined they were well-controlled with medication during the relevant time period. R. at 20. Plaintiff, on the other hand, has cited to a piece of evidence that suggests otherwise. But "once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (citation and internal quotation marks omitted). That is not the case here.

Even assuming it was, though, any failure at this step would be harmless in the context of this case. The ALJ found other impairments to be severe, continued the sequential evaluation, and explicitly considered the issue of her migraine headaches (even though she found them to be non-severe) when later formulating the RFC. *See, e.g.*, *Reices–Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order) (finding step two error harmless where non-severe impairments were considered at subsequent steps); *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) ("[I]n assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe*."). Accordingly, this argument will be rejected.

## 2. The RFC Determination

Next, plaintiff argues the ALJ applied the wrong legal standards when evaluating the various medical opinions in the record and failed to formulate an RFC that accounted for the

true extent of her work-related limitations. Pl.'s Mem. at 17-36.

"Where, as here, the ALJ finds at step two that a claimant has one or more 'severe' impairments but determines at step three that the claimant is not presumptively disabled, the ALJ must go on to make an RFC finding, which is an assessment of 'what an individual can still do despite his or her limitations.'" *Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 192 (N.D.N.Y. 2019) (quoting *Cox v. Astrue*, 993 F. Supp. 2d 169, 183 (N.D.N.Y. 2012) (McAvoy, J.)).

"In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and symptomatology], including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Samantha S. v. Comm'r of Soc. Sec.*, 385 F. Supp. 3d 174, 183 (N.D.N.Y. 2019) (citation omitted).

"The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626 (S.D.N.Y. 2019) (citations omitted). "In practice, administrative law judges rely principally on medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities." *Tammy Lynn B.*, 382 F. Supp. 3d at 192-93 (citation omitted).

### a. Dr. Mulholland

Plaintiff's first RFC-related argument is about a medical source statement offered by Jeffrey M. Mulholland, M.D., a general practitioner and plaintiff's long-time treating primary care provider. Pl.'s Mem. at 17-25. According to plaintiff, the ALJ failed to consider the

appropriate regulatory weighing factors, failed to follow the "treating physician rule," and failed to provide "good reasons" to afford less than controlling weight to Dr. Mulholland's assessment of her various limitations. *Id*.

Broadly speaking, the Regulations divide evidence from a claimant's medical sources into three categories: (1) treating; (2) acceptable; and (3) other.[7] The most important of these is the treating source category, which includes a claimant's "own physician, psychologist, or other acceptable medical source" who has provided "medical treatment or evaluation and who has, or has had an ongoing treatment relationship" with the claimant. *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

The opinion of a treating source regarding the nature and severity of a claimant's impairments is entitled to *controlling* weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted). And when a treating source's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts, an ALJ may afford it less than controlling weight. *Id*. In fact, a treating physician's opinion may also be properly discounted, or even entirely rejected,

---

[7] On January 18, 2017, the Social Security Administration made revisions to the rules regarding the evaluation of medical evidence. Because plaintiff's claim was filed before March 27, 2017, the prior policies govern here. *See, e.g.*, *Daniels ex. rel. D.M.G. v. Comm'r of Soc. Sec.*, 2018 WL 5019746, at *6 n.13 (S.D.N.Y. Sept. 30, 2018) (explaining the elimination of the treating physician rule and related changes); *Perez v. Comm'r of Soc. Sec.*, 2019 WL 359980, at *6-*7 nn. 6-8 (E.D.N.Y. Jan. 29, 2019) (explaining various changes effective to claims filed after March 27, 2017).

when:  (1) it is internally inconsistent; (2) the source lacks underlying expertise; (3) the opinion is brief, conclusory, or unsupported by clinical findings; or even where (4) it "appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected."  *Id*. (citation omitted).

Where an ALJ decides to afford a treating source's opinion less than controlling weight, he must still consider various factors in determining how much weight, if any, to give the opinion, including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) what evidence supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the area of specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant in claimant's particular case.  *Tammy Lynn B.*, 382 F. Supp. 3d at 193-94 (citation omitted).

On May 28, 2014, Dr. Mulholland completed a medical source statement that indicates he has treated plaintiff two to three times a year since September of 2005.  R. at 740-43.  According to Dr. Mulholland's statement, plaintiff was incapable of performing even "low stress" jobs because she suffered chronic pain from her orthopedic condition, and that "long term symptoms [were] expected" as a result of her then-recent lupus diagnosis.  *Id*.

However, Dr. Mulholland's medical source statement did not assess any specific exertional limitations, such as how many minutes plaintiff could stand at a time, how much weight she could lift or carry, or how often she can flex her spine or manipulate objects with her hands.  R. at 740-41.  Instead, Dr. Mulholland's statement indicates that he had not "specifically addressed [these areas] with the patient" and therefore "would defer [the answers to these questions] to ortho[pedic] pain [management] or rheumatology."  *Id*.

Nevertheless, Dr. Mulholland's May 2014 medical source statement does indicate some apparently physical limitations. R. at 740-42. For instance, Dr. Mulholland opined that (1) plaintiff would need a job that permits shifting positions at will from sitting, standing, or walking; and that (2) plaintiff would sometimes need to take unscheduled breaks during an eight-hour work day. *Id*. Dr. Mulholland also opined that plaintiff's "experience of pain or other symptoms would be severe enough to interfere with attention and concentration needed to perform even simple work tasks" on a "frequent" basis. *Id*. at 742.

Dr. Mulholland's May 2014 statement then goes on to assess several different mental limitations. R. at 742-43. According to Dr. Mulholland, plaintiff had "no useful ability to function" in the functional area of performing at a consistent pace without an unreasonable number and length of rest periods, was "unable to meet competitive standards" in the functional areas of maintaining regular attendance and being punctual within customary, usually strict tolerances, dealing with normal work stress, and being aware of normal hazards and taking appropriate precautions, and was "seriously limited, but not precluded" in the functional area of completing a normal workday and workweek without interruptions from psychologically based symptoms. *Id*. at 742-43.

Dr. Mulholland further opined that plaintiff "will not be able to work in any prolonged capacity" because her "daily symptoms would lead to very frequent absences limiting her usefulness to any employer" and that her "pain would alter [her] mental health and performance." R. at 743. Because of these limitations and her experience of chronic pain, Dr. Mulholland expected plaintiff to be absent from work "more than four days per month." *Id*.

The ALJ devoted a significant portion of his narrative discussion to this May 2014

opinion, but ultimately afforded it "less than significant evidentiary weight." R. at 21. In so doing, the ALJ acknowledged plaintiff's treating relationship with Dr. Mulholland and recognized that, in Dr. Mulholland's opinion, plaintiff's experience of chronic pain had led to anxiety and attendant mental health limitations on her ability to work. *Id*.

However, the ALJ reasoned that Dr. Mulholland's conclusions were inconsistent with plaintiff's activities of daily living and were, overall, an inaccurate view of "claimant's ability to engage in a routine." R. at 21. In reaching that conclusion, the ALJ explained that plaintiff's testimony about her prior work as a babysitter required her to "consistently" be present and available for at least three hours a day, and that during this time she had no control over when she needed to be available and on-task to care for the two children. *Id*. The ALJ further observed that Dr. Mulholland had explicitly deferred any view about plaintiff's *physical* limitations, and in so doing had stated that he had not "discussed" these issues with plaintiff. *Id*.

Plaintiff contends the ALJ committed several errors in her consideration of Dr. Mulholland's opinion. Pl.'s Mem. at 17-25. First, plaintiff argues the ALJ failed to "expressly apply" all of the so-called *Burgess* factors (the above-listed regulatory factors), such as the frequency, length, nature, and extent of the treatment relationship between the provider and the claimant. *Id*. at 18.

This argument is not a basis for remand. The Second Circuit has repeatedly stated that it does not require a "slavish recitation of each and every [regulatory] factor where the ALJ's reasoning and adherence to the regulation[s] are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). This remains true "even where the ALJ fails to explicitly apply the '*Burgess* factors' . . . [as long as] 'the substance of the treating physician

rule [is] not traversed.'" *Graham v. Berryhill*, 397 F. Supp. 3d 541, 553 (S.D.N.Y. 2019) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019).

In other words, the ALJ need not mechanically recite the various regulatory factors as long as the record reflects a proper application of the substance of the rule. *See, e.g.*, *Petrie*, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (noting that an ALJ need not expressly recite each factor so long as it is "clear from the record as a whole that the ALJ properly considered" them). The record reflects that the ALJ did so in this case. *See* Def.'s Mem. at 10-11.

Second, plaintiff contends the ALJ accorded too much significance to the inconsistency between plaintiff's reported daily activities, including her past work as a babysitter to two young children, and Dr. Mulholland's much more restrictive opinion about how her mental impairments limited her ability to do work activities. Pl.'s Mem. at 19-22. Among other things, plaintiff argues that the ALJ mis-characterized plaintiff's actual contributions to the babysitting work at issue. *Id*. According to plaintiff, the ALJ failed to account for the fact that plaintiff's own children helped out with child care responsibilities whenever plaintiff's pain or other limitations forced her to take breaks, rest, and/or lie down. *Id*. at 21-22.

Upon review, this argument will also be rejected. Unquestionably, a claimant need not be bedridden to be found disabled under the regulations. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Indeed, "people should not be penalized for enduring the pain of their disability in order to care for themselves." *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000).

Even so, the regulations explicitly direct the ALJ to consider a claimant's activities of

daily living when assessing the ultimate question of disability. *See Coger v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 427, 436 (W.D.N.Y. 2018); *see also Coyle v. Comm'r of Soc. Sec.*, 2018 WL 3559073, at *7 (July 24, 2018) (Carter, M.J.) ("[A]n ALJ may rely on Plaintiff's activities of daily living in weighing opinion evidence in the record.").

Plaintiff is of course correct that the "ability to care for one school aged child in her home" does not, *ipso facto*, prove that she has "the ability to perform the mental demands of substantial gainful work in a typical competitive workplace environment." *Coyle*, 2018 WL 3559073, at *7. However, it is also true that, as with activities of daily living, the regulations explicitly contemplate that the ALJ can consider work performed by the claimant, even if that work falls below the level of substantial gainful activity, because it might suggest that plaintiff can perform at a more demanding level. 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

Thus, plaintiff's argument again fails to acknowledge that the ALJ is vested with the responsibility to weigh these conflicting issue and resolve this kind of *genuine* conflict in the record. *See Doty*, 2017 WL 4621630, at *6. On the one hand, plaintiff characterizes her past child care activities as being performed at something far less than a sustained, consistent level and, with the help of her own children, she was able to take the kind of frequent, unscheduled breaks during this work that would almost certainly not be permitted in a competitive work environment. On the other hand, the ALJ characterizes plaintiff's child care activities, coupled with other evidence in the record, as being indicative of an ability to engage in a routine that would permit at least sedentary work with certain additional limitations (during the relevant time period, at least). In reaching that eventual conclusion,

the ALJ stated that:

> In sum, the claimant's cervical spine surgery took place in 2007. She has worked since that time and the medical evidence of record during the period in issue shows that the claimant has done very well. Her seizure activity is intermittent, and like her headaches, controlled with medication. The claimant did not stop childcare activity during the unadjudicated period and routinely watched children 3 hours per day, in the morning and after school. There is no evidence of any significant increase in her symptoms associated with clinical and/or diagnostic findings between December 27, 2013 and September 30, 2014 that would further reduce the residual functional capacity.

R. at 22.

An independent review of the record confirms that there is substantial evidence to support this view of the evidence. And an independent review of the ALJ's decision confirms that she applied the correct legal standards in reaching this view. This case is therefore unlike the child care at issue in *Coyle*, where U.S. Magistrate Judge William B. Mitchell Carter vacated the ALJ's decision because the "ALJ appear[ed] to rely almost exclusively on Plaintiff's ability to care for one school aged child in her assessment of opinion evidence and ultimate mental RFC determination and [ ] *did not discuss other medical evidence in the record*." *Coyle*, 2018 WL 3559073, at *7 (emphasis in original). Accordingly, plaintiff's arguments about Dr. Mulholland's opinion do not provide a basis for remand.[8]

### b. Upper Extremities

Plaintiff's next RFC-related involves a March 7, 2014 statement from Joseph Catania,

---

[8] Plaintiff contends in passing that the ALJ also improperly rejected a June 2014 statement by Physician Assistant Jeff Slavich. Pl.'s Mem. at 24. But as the Commissioner notes, PA Slavich left the questionnaire almost completely blank, and included notations stating (1) that he did not conduct any testing of plaintiff's functional limits and (2) instructing plaintiff to get her functional capacity tested by a "qualified physical therapist." R. at 744-46. The ALJ did not err in rejecting this opinion because it is unsupported by an explanation or rationale. *See, e.g.*, *Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (summary order).

M.D., a physician at New York Spine & Wellness Center, and a December 4, 2013 opinion by Raymond Alcuri, M.D., another physician at the same medical practice. Pl.'s Mem. at 25-30.

On March 7, 2014, plaintiff met with Dr. Catania, a spinal specialist at the practice where her spinal surgery took place, for treatment and follow-up. R. at 823. Dr. Catania's treatment/progress note includes a "work/school note" that states plaintiff had a lifting restriction of "5-10lbs" and that she would need to "move around on a periodic basis throughout the day." *Id*. Dr. Catania's note further states that plaintiff is "unable to perform any repetitive work with upper extremities."

The ALJ evaluated this note and concluded that it was of "significant evidentiary value." R. at 21. In so doing, the ALJ adopted Dr. Catania's lifting restriction but rejected his conclusion that plaintiff could not perform *any* repetitive work with her upper extremities. *Id*. In the ALJ's view, Dr. Catania's restrictive assessment of her ability to use her upper extremities was inconsistent with the longitudinal record evidence and more restrictive even than Dr. Catania's own contemporaneous treatment note. *Id*.

Further, the ALJ concluded that this upper-extremity limitation was inconsistent with the less restrictive limitations assessed by Elke Lorensen, M.D., a consultative physician who examined plaintiff on June 6, 2013, a date just before plaintiff's amended alleged onset date. R. at 627-30. In light of this conflicting evidence, the ALJ adopted a middle ground, formulating an RFC that includes "frequent, but not unlimited, use of her upper extremities." *Id*. at 21.

Upon review, there is no reversible error in that conclusion. Rather, the record reflects that, once again, the ALJ resolved genuine conflicts in the record by weighing Dr. Catania's findings of limitation against other less, restrictive findings present in the record. Perfect or

not, the ALJ pieced together an overall RFC assessment using properly submitted medical opinions and other competent evidence in the 2,400-page administrative record. *See Samantha S. v. Comm'r of Soc. Sec.*, 385 F. Supp. 3d 174, 185 (N.D.N.Y. 2019). In the process, the ALJ applied the correct legal standards, identified substantial evidence in support of her partially contrary findings, and supplied a sufficient narrative rationale to permit meaningful judicial review.[9] Because nothing more is required of the ALJ, this argument will also be rejected.

### c. Sitting and Standing

Next, plaintiff contends the ALJ's RFC finding about her general ability to sit and stand fails to account for evidence of a more specific sitting and standing limitation. Pl.'s Mem. at 30-35. According to plaintiff, none of the medical opinions in the record indicate that she could stay in one position for 30 minutes (as the ALJ found), or that she could remain at her work station when changing position (as the ALJ also found). *Id*. In plaintiff's view, the medical opinions that state she "must walk at times at an unpredictable and [on an] unscheduled basis [ ] completely erode the occupational basis for both sedentary and light work." *Id*. at 32.

Upon review of this argument, the ALJ did not err. It is true that certain physicians opined, more generally, that plaintiff would need to "get up and move around on a periodic basis throughout the day." R. at 812. Based on this and other evidence in the record, the ALJ formulated an RFC that included the following limitation: "claimant should be able to

---

[9] Plaintiff correctly notes that the ALJ did not expressly discuss Dr. Alcuri's December 4, 2013 note. R. at 812. However, Dr. Alcuri is from the same practice as Dr. Catania and his "work/school note" assesses precisely the same lifting and work restrictions as Dr. Catania's March 7, 2014 "work/school note." *Compare* R. at 812, *with* R. at 823.

change positions every 30 minutes and retains the ability to stay on task at the work station during the position change." R. at 18.

Plaintiff insists that this component of her RFC is insufficiently restrictive, since none of her medical providers ever specifically stated that "30 minutes" would adequately account for her need to move around throughout the day. Pl.'s Mem. at 32. But as this court and others have repeatedly stated, the ALJ is not required to adopt wholesale any specific limitation assessed by any one provider. Rather, "it is the ALJ's responsibility to 'choose between properly submitted medical opinions and other competent evidence to piece together an overall [RFC] assessment.'" *Robles v. Colvin*, 2016 WL 814926, at *4 (N.D.N.Y. Feb. 29, 2016) (quoting *Crofoot v. Comm'r of Soc. Sec.*, 2013 WL 5493550, at *8 (N.D.N.Y. 2013)).

The ALJ reached a reasonable result by incorporating a position-change restriction into her RFC finding, and it is one that is supported by substantial evidence. To overcome this finding, plaintiff would need to demonstrate that a reasonable factfinder would be *obligated* to reach the more specific and more restrictive conclusion she advances. *See, e.g.*, *Brault*, 683 F.3d at 448. But plaintiff has not carried this burden. Accordingly, this argument will be rejected.

### d. Stress & Substantial Evidence

Finally, plaintiff contends the ALJ's RFC fails to "acknowledge the interplay between Plaintiff's stress and pain, including her migraine headaches." Pl.'s Mem. at 34. This argument is not a basis for remand, either. Although the ability to handle work-related stress is an important component of the RFC determination, it is not a roadblock to competitive work under all circumstances. *See, e.g.*, *Herb v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 441,

447 (W.D.N.Y. 2019) (citation omitted). The ALJ discharged her duty to consider whether to include any stress-related limitations in this case by noting, *inter alia*, that plaintiff's migraine headaches were well-controlled with medication during the relevant time period and by largely discounting Dr. Mulholland's May 2014 opinion, which assessed stress- and anxiety- related limitations. Accordingly, this argument will also be rejected.

## V. CONCLUSION

The ALJ applied the appropriate legal standards and supported her written decision with substantial evidence in the record.

Therefore, it is

ORDERED that

1. Plaintiff's motion for judgment on the pleadings is DENIED;

2. The Commissioner's motion for judgment on the pleadings is GRANTED;

3. The Commissioner's decision is AFFIRMED; and

4. Plaintiff's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

Dated: January 9, 2020
        Utica, New York.

_____
United States District Judge